Sam W. MASTEN, P. C., A Professional Corporation, and Sam W. Masten, Individually, Plaintiffs,

v.

LIFE INVESTORS INSURANCE COMPANY OF AMERICA, a corporation, Defendant.

No. CIV–78–4101.

United States District Court, D. South Dakota, S. D.

July 31, 1979.

David V. Vrooman, Sioux Falls, S. D., for plaintiffs.

Gary P. Thimsen, of Woods, Fuller, Shultz & Smith, Sioux Falls, S. D., for defendant.

## MEMORANDUM DECISION

NICHOL, Chief Judge.

The plaintiffs seek to recover damages from the defendant for its alleged breach of contract. The following memorandum decision constitutes this court's findings of fact and conclusions of law pursuant to F.R. Civ.P. 52. For the reasons stated herein the court finds in favor of the plaintiffs.

One of the plaintiffs, Sam Masten, individually, is a well known, highly regarded attorney who has practiced law in the State of South Dakota for over 30 years. In the Fall of 1976, he was practicing law as a solo practitioner. For a number of reasons, he became interested in turning his practice into a professional corporation. Toward that end, he obtained a charter from the State of South Dakota in December of 1976, but the charter was not effective until February 1, 1977. At that time Mr. Masten's law practice proceeded as a professional corporation and he was joined by his children, Jeff and Mary, who are also attorneys.

Mr. Masten, after deciding to switch his practice to a professional corporation, consulted with Richard Dougherty, an insurance agent in Sioux Falls, about a complete overhaul of his insurance portfolio. Included in Mr. Dougherty's review was an analysis of Mr. Masten's life and health insurance needs. It was agreed that along with incorporation there should be some changes in Mr. Masten's insurance portfolio.

Mr. Masten, by a check dated December 15, 1976, paid $5,000 to United of Omaha, for life, health and retirement insurance. The check was given to the Dougherty agency, "to get the ball rolling" with regard to Mr. Masten's insurance program.

In order to obtain insurance, it was necessary for Mr. Masten to undergo a physical examination by a physician. He did so in Canton in January of 1977 but the Company requested that a doctor of their choice conduct the exam. Mr. Masten underwent an examination by the "company doctor" on April 22, 1977, and passed that examination but it was determined that Mr. Masten did not qualify for insurance with United of Omaha. Furthermore, the idea of group health insurance was tabled until other health insurance covering Mr. Masten had run out so that there would be no duplication.

Eventually, it was determined by Mr. Dougherty and Mr. Masten that a group policy with Heart of America Trust would suit the needs of the newly incorporated law practice. The monthly premium covering health insurance was paid regularly for coverage which was to begin June 1, 1977. There is no disagreement between the parties that the premium was paid and the policy was to become effective June 1, 1977.

On May 31, 1977, Sam Masten was in Rapid City, South Dakota, attending to legal business which had taken him to that part of the State. He made an appearance in bankruptcy court in Rapid City on the afternoon of the 31st and returned to Sioux Falls that evening. Mr. Masten became ill during the evening hours of the 31st and decided to check into Sioux Valley Hospital at 10:00 P. M.

Mr. Masten was not released from Sioux Valley Hospital until June 10, 1977. During his stay in Sioux Valley several medical problems were diagnosed and treated, though some were not treated until much later. The evidence shows that Mr. Masten's doctors diagnosed his kidney stone problem on June 2, 1977, but did not remove the kidney stones until August of 1977. Doctors also diagnosed a urinary tract infection which was treated during his stay at Sioux Valley. Cancer of the prostate was also diagnosed during this stay and treatment was administered over the course of several months following Mr. Masten's release from Sioux Valley June 10, 1977.

During his stay at Sioux Valley, Mr. Masten continued to practice law. The evi-

dence shows that his office called him nearly 20 times to talk with him about legal matters that were pending with the Masten professional corporation. A list of phone calls made by Mr. Masten to the law office was not available. Clients came to the hospital to consult with Mr. Masten. Mr. Masten's son, Jeff, saw him daily so that clients' business could be discussed and the office routine could continue as if nothing had happened. Constant communication between Mr. Masten, his clients, his son Jeff and his office was evidenced. Jeff spent at least an entire afternoon with Mr. Masten at Sioux Valley preparing for an argument in front of the Supreme Court of South Dakota. In addition to the phone calls, client consultation and consultation with other members of the professional corporation, it appears that Mr. Masten was mapping out the strategy for other lawsuits including one in which he appeared on June 13, 1977, just 3 days after his release from the hospital. Clearly, Mr. Masten's work constituted a continuum of calls, consultations and cogitations about legal matters for his employer, Masten Professional Corporation.

At the time he was in the hospital, from May 31 to June 10 of 1977, Mr. Masten was receiving his usual draw from the Masten Professional Corporation. Exhibit O shows Mr. Masten was receiving $4,000 per month during this period in 1977. He was paid wages of $4,000 less withholding of $1,041.60 and $234.00 Social Security for a total of $2,724.40 on May 20, 1977. On June 15, 1977, his next pay period, he received a similar check for the same amount.

Mr. Masten's insurance policy, Exhibit A, contains the following provision:

Eligible Status. Each person, not excluded below, who is in regular, full time active employment as an employee of a Participating Employer is in an eligible status hereunder. Each partner or proprietor is in an eligible status provided he is actively working full time in the conduct of the business of a Participating Employer.

The defendant has refused to pay the expenses of Mr. Masten for his stay in the hospital from May 31 to June 10, 1977, for the reason that it is its belief that Mr. Masten was not in "regular, full time active employment as an employee of a Participating Employer" and therefore was not in an eligible status. Furthermore, the defendant has refused to pay any of the expenses Mr. Masten has incurred with respect to his subsequent treatment for cancer of the prostate and treatment for his kidney stones. The defendant's reason for its refusal to pay for subsequent treatments is its belief that since Mr. Masten was not in an eligible status on June 1, 1977, and did not become eligible until July 1, 1977, he received treatment or advice for a sickness within 180 days prior to the effective date and therefore is not entitled to any compensation for said subsequent treatments.

The specific contractual reasons for the company's denial of benefits are contained in the following provision:

## LIMITATIONS APPLICABLE TO ALL MEDICAL EXPENSE BENEFITS

General Limitations. Unless specific exceptions to the following General Limitations are made, no Medical Expense Benefits shall be payable for or on account of expense incurred: . . .

9. For expense incurred in connection with any bodily injury or sickness for which an insured person has received treatment or advice by a doctor within 180 days prior to the effective date of his insurance hereunder until a period of a (sic) least 180 consecutive days, ending on or after such effective date has elapsed during which no treatment has been received and no expense was incurred on account of such injury or sickness or on account of any complications therefrom. However, in any event, coverage will be provided for pre-existing conditions when the insured person has been covered under the policy for a period of 12 consecutive months.

Mr. Masten informed the defendant company of his hospitalization within the time period allowed by the policy. He continued

to pay his premiums and he believed that he was covered by the policy effective June 1, 1977. (In fact, as Mr. Masten testified at trial, he believed that he was covered by the insurance when the policy was delivered to him in early May of 1977 but that is not an issue before this court.) The defendant company did not inform Mr. Masten until sometime in November of 1977 that it did not believe that Mr. Masten was covered from June 1, 1977, and that it was issuing him a "new" policy with an effective date of July 1, 1977. This was well after Mr. Masten's initial hospitalization and the subsequent treatment for kidney stones which occurred in August of 1977. During this time period, Masten Professional Corporation made regular monthly payments to the defendant. In a letter dated November 1, 1977, Carl Marx, supervisor for the defendant, informed Mr. Masten that the effective date of his policy had been changed and that the June premium would be refunded under separate cover. Exhibit AZ shows that the December 1, 1977, billing credited the Masten P.C. account for the June premium which had been paid for Sam Masten. This occurred nearly six months after the initial hospitalization and four months after Mr. Masten's treatment for kidney stones.

■ This court has jurisdiction in this case by virtue of 28 U.S.C.A. Section 1332 (1976). In diversity of citizenship cases the law to be applied is the law of the state in which the court is sitting. *Erie R. R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Bergstreser v. Mitchell,* 8 Cir., 577 F.2d 22 (1978); *Cote v. Chesley,* 8 Cir., 577 F.2d 71 (1978). Thus, where substantive law is to be applied, this court is bound to apply South Dakota law.

This court addresses only the plaintiffs' theory that Mr. Masten was "in regular, full time active employment." The question presented to this court, of course, is whether an attorney who is being hospitalized can be considered, for purposes of health insurance coverage, in regular full time active employment.

■ Under South Dakota law, it is a well settled principle that a contract of insurance is to be construed liberally in favor of the insured and strictly against the insurer. *Dairyland Ins. Co. v. Kluckman,* 86 S.D. 694, 201 N.W.2d 209 (1972); *Presentation Sisters Inc. v. Mutual Ben. Life Ins. Co.,* 85 S.D. 678, 189 N.W.2d 452 (1971). Furthermore, and more to the point, if any term or provision in the insurance contract is ambiguous, uncertain or susceptible to more than one meaning it is to be construed strictly against the insurer and liberally in favor of the insured. *Wilson v. Allstate Ins. Co.,* 85 S.D. 553, 186 N.W.2d 879 (1971); *Aetna Ins. Co. v. Labor,* 85 S.D. 192, 179 N.W.2d 271 (1970); *Duerksen v. Brookings Intern. Life & Cas. Co.,* 84 S.D. 20, 166 N.W.2d 567 (1969). Finally, all conditions and provisions of an insurance policy must be construed together for the purpose of giving effect to each clause. *Sunshine Mutual Ins. Co. v. Addy,* 74 S.D. 387, 53 N.W.2d 539 (1952); *Peterson v. Great American Ins. Co.,* 74 S.D. 334, 52 N.W.2d 479 (1952).

The defendant takes the position that Mr. Masten's hospitalization prevented him from being in regular, full time active employment. This court is not willing to hold that hospitalization prohibits a person from being in regular, full time active employment. Certainly, there are a number of professions which do not require a person to be in a specific place or to meet with specific individuals. An artist can create a masterpiece nearly anywhere including his hospital bed. Beethoven, Bach, Wagner, Chopin or any of the other great composers could have composed their great works in a park, at the beach or in a hospital bed. Authors, too, need not be in any particular place in order to write their books or articles. In fact, some great works have been written on deathbeds. One can conceive of a veritable plethora of occupations which do not require that the employee perform his duties in a particular place or meet with certain individuals. There are numerous shapes and sizes of businessmen in various types of businesses who perform their duties almost exclusively over the telephone and the mere fact that they are confined to

a particular location does not hamper them in the least. (We regularly see telephone advertisements encouraging businessmen and professionals to use the phone for any and possibly all of their work.)

██ The question of regular, full time active employment must be judged with reference to the duties or the services of the particular employee in question and relations and transactions between the employer and the employee. *Great-West Life Assurance Co. v. Levy*, 382 F.2d 357 (10th Cir. 1967). The court in that case specifically held that: "It is not essential to full-time employment that such an employee be regularly and continuously at a particular place, such as the employer's office." *Levy, supra,* at 360.

Under circumstances similar to the case at bar, the court, in *Equitable Life Assurance Society of United States v. Worthman,* 67 F.2d 721 (7th Cir. 1933), held that an assistant superintendent of a fuel company, having supervisory duties, could be considered working full time and for full pay, although he was ill and remained at home where he was consulted in connection with his employer's business.

There the assured was an assistant superintendent for a fuel company and had charge of three coal docks employing 200 to 300 men. "His duties were supervisory, not involving physical labor, and his usual headquarters were at an office near one of the docks." *Worthman, supra,* at 722. Under an original group policy effective June 1, 1929, the assured, Worthman, had been carrying $2,000 of life insurance. By a rider attached to such policy dated June 10, 1930, and effective July 1, 1930, the amount of such insurance was increased subject to the condition:

> That employees who on its effective date were not working full time and for full pay should not be eligible for the extended insurance until their return to work at full time and for full pay.

*Worthman, supra,* at 722.

The assured, Worthman, if he met the above condition was eligible for $6,000 of additional insurance. The insurance company in that case resisted payment of the additional insurance because:

> The defense is that, as to Worthman, this extended insurance never took effect, in that he became ill before the effective date (July 1, 1930) of the rider for the extended insurance, and that he was not employed full time from the time his illness began until his death on September 16, 1930.

*Worthman, supra,* at 722.

In connection with the issue of whether the assured, Worthman, was working full time, it appears that on May 22, 1930, he went to the Mayo Clinic for a hernia operation, returning to his home about June 23, 1930. He did not go to the office of his employer but remained at home where he was visited by various of the employees, with some of whom he took up the matter of the employer's business. He was thus at his home until July 12, 1930, when he went to a nearby resort, where he owned a summer cottage, and remained there for about three weeks. On August 12, 1930, he went to a sanitorium where, about four weeks thereafter, he died of gastric carcinoma.

In holding that the decedent's widow was entitled to recover the additional insurance, the court stated:

> It must be considered that, under the terms of the extended insurance, if on the date it became effective, July 1, Worthman was not working full time, it would become effective at any time thereafter when he did render what would amount to full-time service, even if only for a brief period, and that, once effective, it would remain so while the premiums were paid and the employment continued.

> The superintendent also testified that during the period the employer constructed and put into operation a new 250,000-ton capacity coal dock at Milwaukee, and that Worthman, on account of his long experience with coal docks, was called on in advisory capacity respecting this new dock.

> *In the case of such an employee, what might reasonably be considered as full-*

*time service depends largely upon the relations and transactions between employer and employee. It is not essential to full-time employment that such an employee be regularly and continuously at the employer's office. He might at his own home render such advisory and supervisory services as is deemed by the employer to be, and in fact was, a full-time service for the time being. This could have been by conference and consultation with other officers of the employer, and to the employer's entire satisfaction.* (emphasis added.)

*Worthman, supra,* at 723–724.

As in *Worthman, Augusta v. John Hancock Mutual Life Ins. Co.,* 11 Misc.2d 111, 170 N.Y.S.2d 908 (1958), held that the clause "actively at work" within an amendment to a group life policy would include an employee who was in the hospital when the amendment became effective. In that case, the amendment increased life insurance benefits for those employees who met certain criteria. The provision which required that the employee be actively at work reads as follows:

. . . if any employee to whom such requested change is to be applicable is not actively at work on the effective date, such change shall not be applicable to such employee until the date of his return to active work.

*Augusta, supra,* at 911.

Mr. Augusta was taken to the hospital on June 12, 1954, the policy amendment took effect on June 28, 1954, and Mr. Augusta died on June 30, 1954.

Mr. Augusta's duties were those of traffic manager, sales manager, and contract administrator for Henty Spen & Co., Inc. Mr. Augusta's superior, Mr. Halpern, visited with Mr. Augusta for the purpose of discussing current business problems that had arisen with respect to Mr. Augusta's duties for an hour to an hour and a half on June 28, 29 and 30, 1954.

The court held that Mr. Augusta was "actively at work" at the time the policy became effective. In so holding the court stated:

It is plain that while in a hospital, one may be actively at work, if his activity consists of giving counsel, advice, and orders, to others, on behalf of his employer. In the absence of some appropriate language compelling a different construction, this would appear to be true if the employee is engaged in work of an advisory or supervisory character, and is not a wage earner, whose duties require manual labor.

*Augusta, supra,* at 916.

The court further stated:

With respect to the defendant's contention that before the decedent could become eligible for the increased insurance coverage provided by the amendment effective June 28, 1954, it was necessary for him to be actively at work on that date, at his employer's premises, or if absent, subject to call, the court finds nothing in the language of the amendment which imposes such limitation. There is a failure to state a specific or clear condition precedent requiring an employee to be actively at work at any given locale or for any specific period of time.

*Augusta, supra,* at 917.

In *Roby v. Connecticut General Life Ins. Co.,* 166 Conn. 395, 349 A.2d 838 (1974), a university professor was held to be in "active service" as required by the terms of a group life insurance policy even though his policy was to take effect on July 1, 1971, during a time when he was assigned no specific duties by the university.

■ Clearly, this court cannot say as a matter of law that a period of hospitalization prohibits one from being in "regular, full-time active employment." At the very least that term is ambiguous. If the defendant insurance company had wanted to exclude coverage during a period of hospitalization it would have been a very simple matter to include such a clause. The case of *Rabinovitz v. Travelers Ins. Co.,* 11 Wis.2d 545, 105 N.W.2d 807, 809 (1960), held that a provision whose effective date is limited to employees who are "actively at work performing all of the duties of his

employment with the Employer Member *at his customary place of employment . . ."* (emphasis added) would prevent a person who was in the hospital at the time of the effective date from being covered. Certainly, if that clause were present in this case, the court would be forced to consider where Mr. Masten's duties were performed. However, in the context of this lawsuit, where the duties are performed is unimportant.

As the court noted earlier, all conditions and provisions of an insurance policy must be construed together for the purpose of giving effect to each clause. In the insurance policy issued to Mr. Masten, Exhibit A, on page 6 there is a provision which sheds some light on its effective date. Under Dependent's Insurance Provisions the policy stated:

Qualification of Effective Date. *If,* on the date his insurance would otherwise become effective or on the effective date applicable to any additional insurance or increased benefits made available as a result of a change in insurance classification or amendment to the policy, *any dependent is confined in an institution operated for the care of mentally or physically sick, injured or disabled persons or otherwise disabled by reason of injury or sickness and thereby prevented from engaging in the usual and customary activities of a person in good health and of the same age and sex, the insurance, additional insurance or increased benefits as the case may be, shall not become effective with respect to such dependent until the dependent is able to resume such regular and customary activities.* (emphasis added.)

Exhibit A, at page 6.

That provision clearly excludes from coverage dependents who, at the time of the effective date, are being hospitalized. There is no such similar provision which would exclude from coverage an employee who at the time of the effective date is being hospitalized. Evidently, that possibility was contemplated by the defendant as is exhibited by the Qualification of Effective Date provision which applies to dependents.

Modern technology has allowed this society to be more mobile and at the same time more productive. Communication devices which allow us to talk on the phone while driving down the highway are commonplace. We can dictate letters while sitting on a mountaintop. Because of technology, the old concept of work being performed only in the office is eroding. This is particularly true in the legal profession. It is not true that a lawyer can be in regular, full-time active employment only when he is in his office or in the courtroom.

Many lawyers regularly perform work at home, in the car, on an airplane or any of a number of other locations. In fact, some unfortunate souls feel compelled to take work with them on their vacations. Attorneys who perform work outside the office and the courtroom undoubtedly charge their clients for such services.

The defendant has suggested that the case of *Commercial Ins. Co. of Newark v. Burnquist,* 105 F.Supp. 920 (M.D.Ia.1952), should control the outcome of this case. Defendant's reliance on *Burnquist* is misplaced. While *Burnquist* has some similarities to the case at hand, it is distinguishable for two reasons. First, and most importantly, the insurance policy in *Burnquist* is considerably different than the one in this case. The particular provision in *Burnquist* which was the subject of the litigation was "active full time duty." Of course, there the court found for the insurance company. However, this court notes that there was no comparable provision in the *Burnquist* policy to the Qualification of Effective Date provision under Dependent Insurance Provisions as there is in the Masten policy. Second, the evidence in this case shows the extensive amount of work performed by Mr. Masten while he was being hospitalized. While Mr. Burnquist was performing some duties during his stay in the hospital, it is not clear that the work he performed there was as pervasive and as time consuming as the work performed by Mr. Masten.

■ Therefore, for all of the foregoing reasons, this court finds and concludes that

Mr. Masten was in regular, full time active employment as an employee of a participating employer.

Attorney's fees and punitive damages will not be awarded in view of the plaintiffs' request to strike those items from his prayer for relief.

Counsel for the plaintiffs shall draw an appropriate judgment reflecting the oral amendments to the complaint at the close of the trial.